UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TIFFANY SPRUILL o/b/o J.T.,

        Plaintiff,

  -vs-

MICHAEL J. ASTRUE, Commissioner of
Social Security,

        Defendant.

_____

**DECISION and ORDER**
**No. 6:12-CV-6060(MAT)**

## I.   Introduction

Represented by counsel, Tiffany Spruill ("Spruill" or "Plaintiff") has brought this action on behalf of her infant son ("J.T.") pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

On July 11, 2009, Spruill filed an application for SSI benefits on J.T.'s behalf. J.T., whose birthday is June 16, 2004, was five years-old at the time of the application. Plaintiff alleged that J.T. had been disabled since June 20, 2006, due to

lead poisoning, attention deficit/hyperactivity disorder ("ADHD"), speech and language delays, and a mood disorder. Benefits were denied, and at Plaintiff's request, a hearing was held on April 11, 2011, before Administrative Law Judge Jennifer Whang ("the ALJ"). The ALJ presided via videoconference. Plaintiff, represented by counsel, testified at the hearing. J.T. was questioned briefly by the ALJ.

On May 20, 2011, the ALJ issued a decision (T.5-11)[1] finding that J.T. had not engaged in substantial gainful activity since the filing date, and that he suffers from the following severe impairments: lead poisoning, ADHD, a mood disorder, and speech and language delays. (T.49). The ALJ found that none of these impairments, singly or in combination, meets or medically equals any of the listed impairments in 20 C.F.R., Pt. 404, Subpt. 1, App 1. The ALJ further determined that J.T. does not have an impairment or combination of impairments that functionally equals a listed impairment.

The ALJ's decision became the final decision of the Commissioner on December 12, 2011, when the Appeals Council denied Plaintiff's request for review. (T.1-3). This timely action followed.

---

[1]     Numerals in parentheses preceded by "T." refer to pages from the administrative transcript, submitted as a separately-bound exhibit in this proceeding.

## III. Factual Background

### A. Medical Evidence

On June 20, 2006, when he was two years-old, J.T. was admitted to the hospital for lead chelation therapy after his mother witnessed him eating paint chips in their new apartment. Blood testing showed a critically elevated level of lead (54 micrograms/deciliter). Upon discharge on June 25, 2006, J.T.'s lead levels had decreased to 35, which was still greatly elevated, given that normal range is between zero and 9 micrograms/deciliter.

J.T. was monitored for lead every three to four months thereafter. Blood test results from May 28, 2009, indicated a level of 9 micrograms/deciliter, within normal range. (T.459).

### B. Academic Evidence (School Records and Teacher Questionnaires)

#### 1. Kindergarten (2009-2010)

According to his Individualized Educational Plan ("IEP") dated June 22, 2009 (T.148), for the 2009-2010 academic year, J.T. was to be provided programming and services for his speech and language impairment. Although he had been making progress in speech therapy during the previous year, he continued to demonstrate a severe delay in expressive syntax skills, a moderate fluency disorder, a mild-to-moderate articulation delay, and a mild receptive language

delay.[2] (T.149). J.T.'s dysfluencies were characterized by word and sound repetitions, with the longest one lasting approximately two seconds. He experienced difficulties with verb tenses, plurals, possessives, and pronouns, sometimes omitting verbs during conversation. He had difficulty interacting socially with his peers. For instance, he sometimes would not take turns and share, and he had trouble expressing his emotions verbally and resolving conflicts with his peers. J.T.'s teacher reported that he had problems maintaining focus and attention in the classroom setting, and was easily distracted during most activities.

The IEP was amended on August 28, 2009, to indicate that he was to be picked up at his house rather than at the regular bus stop because of his "inability to communicate" due to his speech/language delays. (T.583).

---

[2]

"Fluency" refers to the "overall flow or rhythm of speech production[,]" and "[t]ypically, speech is produced with relatively few hesitations, few word repetitions, and no part-word or sound repetitions." http://www.health.ny.gov/community/infants_children/ early_intervention/disorders/ch2_bkgr.htm (last accessed Feb. 27, 2013). The term "articulation disorder" refers "primarily to speech sound disorders in which the underlying problem appears to be in the motor-speech production mechanism. Id. In such cases, sound errors take the form of distortions, omissions or substitutions, and the child is unable to correctly produce the affected sounds, even when provided with an imitative model." Id. A "receptive language delay" refers to the child's ability to comprehend language. Id. A delay in "expressive syntax skills" pertains to the child's ability to understand the system governing the order and combination of words to form sentences and the relationships among the elements within a sentence (syntax) in the context of appropriately using words or gestures (expressive language). Id.

### 2. First Grade (2010-2011)

J.T.'s IEP dated May 3, 2010, for the upcoming 2010-2011 school year reflected that the special pick-up requirement was still in place, due to his continued communication difficulties.

J.T.'s first grade teacher, Kimberly Persica, completed a Teacher Questionnaire dated November 17, 2010. (T.227-34). Ms. Persica noted that J.T. required additional support and modifications, including one-on-one ("1:1") assistance to complete tasks; repeated verbal directions; reduced written directions; and reduced assignments. (T.228).

In the domain of Attending and Completing Tasks, J.T. had "obvious" problems in multiple areas: he was frequently off-task, was not a self-starter, was often talking to or bothering his neighbors, and was often distracted or daydreaming during direct group instruction. (T.229).

In the domain of Interacting and Relating With Others, J.T. had "obvious" problems and required being held to consistent expectations and given consistent consequences, with no variances. (T.230). Ms. Persica added that J.T. was performing below standard in all areas despite Academic Intervention, Primary Project, and Speech Services. (T.234). He had great difficulty with phonics and decoding skills, and his speech problems "greatly impacted his progress" in writing and reading. (T.234).

Amy Ellis completed a Teacher Questionnaire on March 10, 2011, during the second semester of his first grade year. (T.239-46). Ms. Ellis found that J.T. scored low in the domain of Acquiring and Using Information because of his short attention span, lack of academic motivation, and difficulty focusing on the tasks required of him. (T.240). He frequently asked to work 1:1 with the teacher, and was permitted to do so. "With extra guidance and very positive encouragement," J.T. was able to complete his work, but he had "great difficulty" working independently. J.T. needed to be given extra help daily in the classroom. (T.240).

In the domain of Attending and Completing Tasks, Ms. Ellis found that J.T. had a "serious problem" in the following areas: (1) refocusing to task when necessary; (2) completing class assignments; (3) working without distracting self or others; and (4) working at a reasonable pace and finishing assignments on time. (T.241). In the domain of Interacting and Relating with Others, J.T. had a "serious problem" in the following areas: (1) expressing anger appropriately; (2) following rules in the classroom and during games and sports; (3) respecting and obeying adults in authority; and (4) taking turns in a conversation. (T.242). Ms. Ellis noted that J.T. required an "unusual degree of structure" and seemed to do worse when changes in his environment occurred. He required a great deal of positive encouragement to complete tasks. (T.242).

In the domain of Caring for Himself, J.T. had a "serious problem" in these areas: (1) handling frustration appropriately; (2) being patient when necessary; (3) responding appropriately to changes in his own mood (i.e., self-calming); and (4) using appropriately coping skills to meet the daily demands of school. (T.244). J.T. "rarely" was able to express why he would get so angry. (T.244). When asked, he would simply continue to clench his fists and roll his eyes upwards. (T.244).

Ms. Ellis noted that waiting his turn was very difficult for J.T., and he would stomp, be grumpy, and refuse to do his work. Most mornings, he was "grumpy and remained grumpy on and off all day." (T.245). Ms. Ellis was "unsure" if he would be classified as depressed, but he was "very moody." (T.245). If another student accidently touched him, J.T. was quick to react by kicking the offending child. (T.246). Ms. Ellis noted that since January 2011, however, his behavior had improved. (He used to throw furniture, push tables, and pose a physical treat to himself and others.) (T.246). Ms. Ellis observed that "[n]ot knowing" how J.T. was going to react to a situation was "probably the hardest part" of being his teacher. (T.246). In addition, he seemed to require much more time and attention than the other students in her class.

Plaintiff's daycare provider, Quiana Jackson, completed a Teacher Questionnaire on March 21, 2011. (T.249-56). Ms. Jackson's

comments and ratings echoed those offered by Ms. Ellis in her March 10, 2011 Teacher Questionnaire.

### 3. Second Grade (2011-2012)

Ms. Persica completed a second Teacher Questionnaire (T.259-67) on September 20, 2011, during the first semester of J.T.'s second-grade year. In the domain of Acquiring and Using Information, Ms. Persica determined that J.T. had "serious problems" (1) understanding school and content vocabulary; (2) reading and comprehending written material; and (3) expressing ideas in written form. J.T. required modified directions, reduced/simplified content, small group or 1:1 instruction, and he had difficulty expressing his ideas due to his "very jumbled" speech. (T.260).

In the domain of Attending and Completing Tasks, Ms. Persica noted that J.T. had "serious problems" with (1) focusing long enough to finish assignments or tasks; (2) refocusing to task; (3) carrying out multi-step instructions; (4) working without distracting himself or others; and (5) working at a reasonable pace and finishing on time. J.T. continually talked out of turn and distracted the other students, and needed frequent reminders to stay focused and on task. (T.261). J.T. would not look at the teacher during group instruction because he was preoccupied with other things. (T.261).

In the domain of Interacting and Relating with Others, Ms. Persica indicated that J.T. had great difficulty sustaining conversation and expressing his thoughts coherently. (T.262).

**C. Evidence from J.T.'s Pediatrician and the Psychiatric Clinic**

Pediatric treatment notes dated April 7, 2010, by Dr. Susan MacKenzie indicate that J.T.'s mother and her long-term live-in boyfriend were greatly concerned about J.T.'s hyperactivity and aggressiveness in school, evidenced by J.T. kicking his teacher and fighting with schoolmates. (T.566). He had been suspended from school twice. (T.566). J.T.'s parents were concerned that he was "hyperactive" and "can be aggressive," although he was "able to do the work" at school. (T.566). Dr. MacKenzie decided to trial him on Dexedrine (dextroamphetamine) sprinkles for his ADHD. (T.567).

At a follow-up appointment on May 6, 2010, Dr. MacKenzie's notes were as follows: "more attentive, more easygoing @ home & school [with] dexadrin [sic]. Doing much better @ school, [decreased] aggression, completing work, does better [with] speech therapy." (T.568). Dr. MacKenzie noted that J.T.'s ADHD symptoms were "greatly improved" with the Dexedrine. (T.569).

Despite the initial improvement, J.T.'s mother reported in May of 2010, that his anger and aggression "seemed to explode", and his teachers could not manage him. (T.570). J.T. was extremely reactive, easily frustrated, and quick to anger. Plaintiff's biggest fear was that J.T. would hurt himself or others. He was

throwing things, knocking over chairs, and once ran out of the classroom. (T.570).

Dr. MacKenzie decided to add Abilify and discontinue Dexedrine. (T.571). As of May 27, 2010, J.T. was still having problems with acting out and being reactive at home and school. There are no notes during this period indicating concerns as to his academic performance. Dr. MacKenzie's notes from the October 29, 2010 appointment indicate that J.T. was having "no problems @ home or school." (T.575) At this time, J.T. was taking Risperdal, which contains risperidone, an atypical antipsychotic.

At J.T.'s pediatrician's recommendation Plaintiff brought J.T. to the Genesee Mental Health Center ("GMHC") for treatment for his ADHD, mood disorder, and acting-out behaviors beginning on October 27, 2010. (T.656). J.T. has been regularly seeing his therapist, Miranda Dennis, LMSW, since that time. (T.661-710). The therapist's notes indicate that J.T. has been making progress behaviorally and academically. (Id.). However, he has been having some symptoms of depression and was started on Celexa in July 2011. (T.695).

## V. Applicable Law

### A. Standard of Review

The Commissioner's decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir.

2002). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). The reviewing court must carefully consider the entire record, examining evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (quoting Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997) (quoting Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Nevertheless, "it is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

This deferential standard is not applied to the Commissioner's conclusions of law, however. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984); see also, e.g., Tejada, 167 F.3d at 773. This Court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. Id.

**B.    Legal Standard for Disability Claims of Children**

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Pursuant to this statutory dictate, the Social Security Administration ("the SSA") has promulgated, by regulation, a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability. 20 C.F.R. § 416.924(a); see also, e.g., Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004).

First, the ALJ determines whether the child is engaged in "substantial gainful activity." Id., § 416.924(b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," in that it causes "more than minimal functional limitations." Id., § 416.924(c). If a severe impairment is present, the ALJ must then consider whether the impairment "meets, medically equals," or, as is more pertinent in J.T.'s case, "functionally equals" a presumptively disabling condition listed in the regulatory "Listing of Impairments." Id., § 416.924(c)-(d); Id., pt. 404, subpt. P, app. 1.

The limitations caused by a child's impairments are evaluated in the context of the following six domains of functioning:

(1) acquiring and using information;
(2) attending and completing tasks;
(3) interacting and relating with others;
(4) moving about and manipulating objects;
(5) caring for oneself; and
(6) health and physical well-being.

20 C.F.R. § 416.926a. In order to demonstrate functional equivalence, the child must exhibit a "marked" limitation in two of the domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the child's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C); see also 20 C.F.R. § 416.926a(e)(2)(i) (An impairment is a "marked limitation" if it "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."). An "extreme limitation" is defined as a limitation that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## VI. Discussion

In her motion for judgment on the pleadings, Plaintiff states that there are two issues presented for review: (1) whether the ALJ erred when she determined that J.T. does not have an impairment or combination of impairments that functionally equals a listed

impairment; and (2) whether the ALJ erred in assessing J.T.'s mother's credibility. See Plaintiff's Memorandum of Law ("Pl's Mem.") at 1 (Dkt #10-1).

**A. The ALJ's Finding Regarding Functional Equivalence**

Plaintiff challenges the ALJ's findings of "less than marked" limitations in the following domains: Acquiring and Using Information (T.53) and Attending and Completing Tasks (T.54). Because Plaintiff challenges only the ALJ's findings as to Acquiring and Using Information and Attending and Completing Tasks, the Court's analysis will be limited to these two domains of functioning.

**1. Acquiring and Using Information**

In evaluating the level of impairment in "acquiring and using information," consideration must be given to how well the child acquires or learns information, and how well the child uses the information he has learned. 20 C.F.R. § 416.926a(g). Three developmental periods are covered by Plaintiff's application on behalf of J.T.: From the date of application (June 20, 2006) until June 14, 2007, the "[o]lder infants and toddlers (age 1 to attainment of age 3)" phase applies. 20 C.F.R. § 416.926a(2)(ii). From June 15, 2007, until June 14, 2010, the "[p]reschool children (age 3 to attainment of age 6)" phase applies. Id., § 416.926a(2)(iii). Finally, from June 15, 2010, until the present time, the "[s]chool-age children (age 6 to attainment of age 12)"

phase applies. <u>Id.</u>, § 416.926a(2)(iv). Each developmental phase has different criteria and is discussed separately below.

> **a.    Older Infant and Toddler Age (June 20, 2006, to June 14, 2007)**

According to the regulations, older infants and toddlers should be forming concepts and solving simple problems through purposeful experimentation (e.g., taking toys apart), imitation, constructive play (e.g., building with blocks), and pretend play activities. At this age, they should begin to respond to increasingly complex instructions and questions, to produce more words, and to form grammatically correct simple sentences and questions. <u>See</u> 20 C.F.R. § 416.926a(2)(ii).

Plaintiff's argument regarding J.T.'s functional impairments in the domain in Acquiring and Using Information focuses solely on the ALJ's alleged disregard of Teacher Questionnaires by his elementary school teachers, Ms. Persica and Ms. Ellis, and his daycare provider, Ms. Jackson. <u>See</u> Pl's Mem. at 14-15. However, the earliest of these Teacher Questionnaires was not completed until 2010. Thus, this evidence does not apply to the time period from June 20, 2006, to June 14, 2007, the infant/toddler age-range.

Plaintiff has not identified any particular evidentiary support for her contention that J.T. had marked or severe limitations in the domain of Acquiring and Using Information from age 1 to the attainment of age 3. As the ALJ noted, when J.T. was hospitalized for lead exposure in June 2006, a Denver Developmental

evaluation (T.304-06) showed that J.T. "was at age level developmentally." (T.278).

**b.    Preschool (June 15, 2007, to June 14, 2010)**

The regulations explain that when children are old enough to go to preschool or kindergarten, they should be using words to ask questions, give answers, follow directions, describe things, explain what they mean, and tell stories, thereby demonstrating an ability to acquire and share knowledge and experience of the world around them. The regulations state that by the time children begin first grade, they should possess these so-called "readiness skills." 20 C.F.R. § 416.926a(iii).

Again, Plaintiff's argument regarding J.T.'s functional impairments in the domain of Acquiring and Using Information focuses solely on the ALJ's alleged disregard of the Teacher Questionnaires. See Pl's Mem. at 14-15. As noted above, the earliest of these Teacher Questionnaires was not completed until November 17, 2010 (T.227-34). The evidence of the Teacher Questionnaires does not apply to the time period from June 15, 2007, to June 14, 2010, the preschool child age-range.

Plaintiff has not identified any particular evidentiary support for her contention that J.T. had marked or severe limitations in the domain of Acquiring and Using Information from age 3 to the attainment of age 6. The other evidence in the record from this time-period does not support a finding of marked or

severe limitations. In particular, J.T.'s kindergarten teacher, Johanna Stiller completed a Teacher Questionnaire (T.204-10) on October 27, 2009. In the domain of Acquiring and Using Information, Ms. Stiller rated each particular skill area as a "1", indicating that J.T. had "[n]o problem". (T.204). Also during this developmental time-period, state agency non-examining review psychiatrist Dr. K. Prowda completed a Childhood Disability Evaluation form on December 1, 2009, citing to the 2009-2010 Individualized Education Program ("IEP") (T.148-53) as support for his (or her) opinion. (T.376 In the domains of Acquiring and Using Information, Dr. Prowda indicated that J.T. had "less than marked" limitations. (T.377).

> **c.  School-Age (June 15, 2010, to the Present Time)**

A school-age child (between six and twelve years-old) "should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). A child of that age will need to use these skills in academic situations to demonstrate what he has learned (e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions). Id.  A school-age child should also "be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking

questions and expressing [his] own ideas, and by understanding and responding to the opinions of others." Id.

Plaintiff argues that the ALJ failed to properly take into consideration Teacher Questionnaires completed by J.T.'s first grade teachers, Ms. Persica and Ms. Ellis, and his daycare provider, Ms. Jackson. Information from school teachers cannot establish the existence of a medically determinable impairment. See Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006). However, "SSA policy . . . expressly treats teachers as 'valuable sources of evidence for assessing impairment severity and functioning' based on their close interaction with students on a regular basis." Archer ex rel. J.J.P. v. Astrue, ___ F. Supp.2d ___, 2012 WL 6630147, at *9 (N.D.N.Y. Dec. 19, 2012) (quoting SSR 06-03P, 2006 WL 2329939, at *3). "[T]he duration of a teacher's relationship with a claimant, while important, is not dispositive." Id. Instead, SSR 06-03p identifies "a number of factors that hearing officers are advised to take into account when weighing the significance of opinions offered by nonmedical sources, not the least of which includes the consistency of the opinion with other evidence in the record." Id. (citing SSR 06-03p, 2006 WL 2329939, at *4-5 (listing five nonexhaustive factors)).

Here, the ALJ relied upon portions of the Teacher Questionnaires completed by J.T.'s first grade teachers,

Ms. Persica and Ms. Ellis to find that J.T. has "less than marked" limitations in the domain of Acquiring and Using Information:

> [Ms. Persica] reported that the claimant needed some assistance completing tasks. He also benefited [sic] from repeated and reduced directions (Exhibit 12E, p. 2). [Ms] Ellis . . . found that the claimant had a slight problem acquiring and using information. Ms. Ellis reported that the claimant has a short attention span, a lack of academic focus, and difficulty with the tasks required of him. She concluded that the claimant is able to complete his work with extra guidance and positive encouragement (Exhibit 17E, p.2).

(T.53).

Plaintiff notes that Ms. Persica, in her November 17, 2010 Teacher Questionnaire, indicated that J.T. was having a "serious problem" with numerous academic areas. (T.227). The Teacher Questionnaire does not define "serious problem" but, as Plaintiff notes, Section 416.926(e)(2)(i) states that the Commissioner will find that a child has a "marked" limitation in a domain when his impairment interferes "seriously" with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(e)(2)(i). Plaintiff infers that a finding of a "serious" problem in a particular skill area in a domain of functioning should be equated with a "marked" limitation. However, Plaintiff has not cited, and the Court has not found, any cases or other legal authority directly supporting this proposition.

In the domain of Acquiring and Using Information, the Teacher Questionnaire itemizes ten different skills and asks the responder to compare the claimant's functioning to that of same-aged,

-19-

unimpaired children on a scale of 1 ("No problem") to 5 ("A very serious problem"). Ms. Persica rated J.T. as a 4 ("A serious problem") in eight of the ten skill areas: (1) understanding school and content vocabulary; (2) reading and comprehending written material; (3) comprehending and doing math problems; (4) providing organized and oral explanations and adequate descriptions; (5) expressing ideas in written form; (6) learning new material; (7) recalling and applying previously learned material; and (8) applying problem-solving skills in class discussions. (T.228). Ms. Persica rated him as a 3 ("An obvious problem") in the remaining two skill areas: (1) comprehending oral instructions and (2) understanding and participating in class discussions. (T.228).

In the comments section, Ms. Persica noted as follows:

Child needs 1:1 assistance to complete tasks. Needs repeated directions (oral) and reduced directions (written). Needs reduced assignments.

(T.228). However, the ALJ mischaracterized Ms. Persica's comments by stating in her decision that J.T. "needed *some* assistance completing tasks." (T.53) (emphasis supplied). This is an inaccurate interpretation of Ms. Persica's assessment which, fairly read, indicates that *in order to complete any tasks*, J.T. "needs" individualized attention and assistance from his teacher, unlike the remainder of the students in his classroom.

The ALJ somewhat minimized Ms. Persica's comments by finding that J.T. "benefited [sic]" from "repeated and reduced directions."

(T.53). To the contrary, Ms. Persica indicated that J.T. "needs" repeated oral directions, "needs" reduced written directions, and "needs" reduced assignments. She did not qualify or limit the situations in which these modifications are required. Moreover, there is no indication in Ms. Persica's comments that the specified accommodations are optional.

The other Teacher Questionnaire upon which the ALJ relied was provided by Ms. Ellis in March 2011, during the second half of J.T.'s first grade year. In the domain of Acquiring and Using Information, Ms. Ellis rated J.T. as a 1 ("No problem") in one skill area; a 2 ("A slight problem") in seven out of the ten skill areas; and a 3 ("An obvious problem") in one skill area. (T.240). J.T. did not receive any "4" ratings, as he had the previous semester from Ms. Persica. The Court cannot find that the ALJ mischaracterized Ms. Ellis' Teacher Questionnaire, which indicates an improvement in all skill areas in the domain of Acquiring and Using Information. In concluding that Ms. Ellis's Teacher Questionnaire did not show "marked" or "extreme" limitations in the domain of Acquiring and Using Information during the time she had J.T. as a student (the second semester of first grade), the ALJ's finding was supported by evidence having rational probative force.

Even if the Court were to find that Ms. Persica's November 2010 Teacher Questionnaire (covering the first grade, first semester) constituted substantial evidence of a marked limitation

in domain of Acquiring and Using Information, Plaintiff still must show a marked limitation in the second domain, Attending and Completing Tasks. As discussed further below, in the following section, Ms. Persica's November 2010 Teacher Questionnaire cannot provide the required evidentiary support for finding a "marked" or "extreme" limitation in the domain of Attending and Completing Tasks during the first half of J.T.'s first-grade year.

## 2. Attending and Completing Tasks

The domain of attending and completing tasks principally entails an assessment of the degree to which a child can "focus and maintain . . . attention, and . . . begin, carry through, and finish . . . activities." 20 C.F.R. § 416.926a(h). As with the domain of Acquiring and Using Information, Plaintiff's argument relies solely on the ALJ's alleged disregard of the Teacher Questionnaires. See Pl's Mem. at 14-15. The earliest of these Teacher Questionnaires was not completed until November 17, 2010 (T.227-34), as noted above. Plaintiff thus has not identified any substantial evidence to establish "marked" limitations in the domain of Attending and Completing Tasks during the Older Infant and Toddler Age (June 20, 2006, to June 14, 2007) or the Preschool Age (June 15, 2007, to June 14, 2010). The Court's analysis therefore is limited to the School Age time-period (i.e., June 15, 2010, to the present time).

The ALJ found that J.T. had "less than marked" limitations in his ability to attend and complete tasks based upon the Teacher Questionnaires completed in November 2010, and March 2011:

> Ms. Ellis found [in March 2011] that the claimant had obvious trouble attending and completing tasks. She explained that the claimant did not want to pay attention when spoken to directly; he did not like being told what to do or to change his behavior (Exhibit 17E, p.2). Ms. Persica reported [in November 2010] that the claimant was frequently off task; he was often distracted or daydreaming. The claimant was not a self-starter and he often talked to or bothered his neighbors. However, the claimant did stay on task with one on one support (Exhibit 12E, p.3). Accordingly, the undersigned does not find that the claimant has marked or extreme limitations in this area of functioning.

(T.54). Plaintiff argues that the ALJ should have found "marked" limitations in the domain of Attending and Completing Tasks, based on Ms. Persica's and Ms. Ellis's Teacher Questionnaires.

As noted above, Ms. Persica's November 2010 Teacher Questionnaire covered the first half of J.T.'s first-grade school-year. In three out of the ten skill areas (paying attention when spoken to directly, sustaining attention during play/sports activities, and carrying out multi-step instructions) in the domain of Attending and Completing Tasks, Ms. Persica gave a rating of "2", indicating only a "slight problem" in those areas. (T.229). In the remaining seven areas (refocusing to task when necessary, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing own things or school materials, completing

class/homework assignments, completing work accurately without careless mistakes, working without distracting self or others, and working at reasonable pace/finishing on time), Ms. Persica gave a rating of "3", indicating an "obvious problem" in those areas. Ms. Persica did not assign any "4's" (a "serious problem") to J.T. in the domain of Attending and Completing Tasks. (T.229). In concluding that Ms. Persica's Teacher Questionnaire did not show "marked" or "extreme" limitations in the domain of Attending and Completing Tasks during the time she had J.T. as a student (the first semester of first grade), the ALJ's finding was supported by evidence having rational probative force.

Ms. Ellis, J.T.'s other first grade teacher, completed a Teacher Questionnaire in March 2011, during the second semester. In contrast to Ms. Persica, Ms. Ellis assigned several "4's" (a "serious problem") to J.T. in the domain of Attending and Completing Tasks: refocusing to task when necessary, completing class/homework assignments, working without distracting self or others, and working at reasonable pace/finish on time. (T.241). Three of the skill areas in this domain were rated as a "2" (a "slight problem") (paying attention when spoken to directly, sustaining attention during play/sports activities, and changing from one activity to another without being disruptive). (T.241). The remaining six areas were rated by Ms. Ellis as a "3" (an "obvious problem"): focusing long enough to finish assigned

activity or task, carrying out single-step instructions, carrying out multi-step instructions, waiting to take turns, organizing own things or school materials, completing work accurately without careless mistakes). (T.241). Ms. Ellis's comments in this section (i.e., that J.T. does not like being told what to do and getting upset when he is not chosen to answer a question, T.241) pertain more to the domain of Interacting and Relating With Others (T.242).

Even assuming that Ms. Ellis's Teacher Questionnaire constitutes substantial evidence of marked limitations in one domain (i.e., Attending and Completing Tasks) for the second semester of J.T.'s first-grade year, there is not substantial evidence of a marked limitations in the required second domain (Acquiring and Using Information) during this time-period. As discussed above in the previous section, Ms. Ellis, in her March 2011 Teacher Questionnaire, did not find that J.T. had more than "slight problems" in the domain of Acquiring and Using Information. Thus, even construing Ms. Ellis's March 2011 Teacher Questionnaire in the light most favorable to Plaintiff, there is not a sufficient evidentiary basis for finding that J.T.'s impairments are functionally equivalent to a disabling condition.

**B.    The ALJ's Failure to Apply the Appropriate Legal Standards in Evaluating Plaintiff's Credibility**

Plaintiff states that "[i]t doesn't appear that the ALJ made a finding relating to credibility, but [s]he implicitly found [J.T.]'s mother not credible," Pl's Mem. at 18, because the ALJ

stated that "the claimant's non-compliance with treatment and his continued improvement indicate that his impairments are not as severe as alleged." (T.52). Plaintiff argues that the ALJ "did not apply the procedural safeguards set forth in SSR 82-59, which supplies examples of justified circumstances and imposes duties of notification to the claimant before finding failure to follow prescribed treatment." Pl's Mem. at 18.

In general, there are two standards for considering the impact of a claimant's failure to follow prescribed treatment–SSR 82-59 and SSR 96-7p. SSR 82-59 provides that a claimant may be "denied disability benefits if the Secretary finds that she unjustifiably failed to follow prescribed treatment and that if she had followed the treatment, she would not be disabled under the Act." McFadden v. Barnhart, No. 94 Civ. 8734, 2003 WL 1483444, at *8 (S.D.N.Y. Mar. 21, 2003) (citing 20 C.F.R. §§ 404.1530, 416.930; SSR 82-59). Thus, "SSR 82-59 normally applies to a claimant's eligibility for benefits after a finding of disability has been made." Grubb v. Apfel, 98 CIV. 9032 (RPP), 2003 WL 23009266, at *5 (S.D.N.Y. Dec. 22, 2003). Here, the ALJ considered Plaintiff's non-compliance with treatment when evaluating her credibility, and therefore SSR 96-7p, rather than SSR 82-59, applied. Smith v. Astrue, No. 09-CV-470 TJM/VEB, 2011 WL 6739509, at *4 (N.D.N.Y. Nov. 4, 2011).

Under SSR 96-7p, in performing the credibility analysis, the ALJ "must consider the entire case record and give specific reasons

for the weight given to the [claimant's] statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). The Court assumes arguendo that the ALJ erred in discounting Plaintiff's credibility based on her non-attendance at appointments. On the occasions that Plaintiff was not able attend an appointment, her live-in boyfriend, Rondell Jenkins, whom the records indicate shared parenting responsibilities with Plaintiff, would attend the appointment with J.T. In addition, after being notified that her non-attendance could result in termination of services for J.T., Plaintiff's attendance improved.

Nevertheless, the Court cannot find that the ALJ committed harmful error in connection with her assessment of Plaintiff's credibility. In the most recent psychiatric records (e.g., T.670, 677, 679, 693), Plaintiff and Jenkins have reported to J.T.'s therapist that he has made, as the ALJ found, "continued improvement" both behaviorally and academically. Thus, the ALJ's decision to decline to fully credit Plaintiff's testimony has a basis in the evidence of record.

## VII. Conclusion

In affirming the ALJ's decision, the Court is mindful of the serious challenges J.T.'s impairments pose for him, his family, and his teachers. "To say that an impairment does not rise to the level of a disability is not to suggest that it is not difficult or trying." Evans ex rel. T.H. v. Astrue, No. 09 Civ. 8407(RJS), 2011

WL 1345159, at *11 (S.D.N.Y. Mar. 31, 2011). Nevertheless, on the basis of the considerable record developed below, the Court must conclude that the ALJ reached the appropriate decision under the law.

For the foregoing reasons, the Commissioner's decision denying disability benefits is affirmed. Accordingly, it is hereby ordered that Defendant's motion for judgment on the pleadings (Dkt #9) is granted; Plaintiff's motion for judgment on the pleadings (Dkt #10) is denied; and Plaintiff's complaint (Dkt #1) is dismissed.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     March 8, 2013
           Rochester, New York